IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

    v.

RAFAEL ESPINO,

    Defendant.

Case No. 18 Cr. 553 (CRB)

**ORDER DENYING MOTION TO VACATE CONVICTION**

Defendant Rafael Espino moves for an acquittal under Federal Rule of Criminal Procedure 29 or a new trial under Federal Rule of Criminal Procedure 33, following his September 2019 conviction by a jury on one count of conspiracy to possess with intent to distribute one kilogram or more of heroin.

Both motions are denied. Espino argues that there was insufficient evidence that he knew that he was engaged in a narcotics conspiracy specifically, as opposed to a criminal conspiracy generally, but the totality of the evidence allows a rational trier of fact to infer that Espino was a trusted member of the conspiracy who would reasonably be expected to have known the nature of the conspiracy. Alternatively, he argues that a government witness's inadmissible hearsay statement requires a new trial, but the statement is unlikely to have had meaningful impact, as it was not important to the government's case, and there was ample admissible evidence from which the jury could have inferred the statement's content.

# I.  BACKGROUND

## A.  The Controlled Delivery

On May 30, 2018, an Indiana State Police trooper pulled over an SUV driven by Oscar Fabian Garcia Diaz ("Garcia Diaz"). Tr. 59–60. In the course of the stop and ensuing investigation, law enforcement officers discovered and removed from the vehicle two black duffel bags containing approximately twenty kilograms of a substance that was later determined to be heroin. Tr. 69. Garcia Diaz admitted that he had been transporting narcotics, that they were destined for delivery to a hotel in the Bronx, New York, and that he was acting under the direction of his brother Jose Garcia, who was based in Mexico. Tr. 70, 87. Recognizing the potential for a "controlled delivery," the trooper contacted the DEA, which in turn procured Garcia Diaz's cooperation in the controlled delivery. Tr. 78.

On May 31, 2018, the DEA moved Garcia Diaz and the heroin to the DEA office in Newark, New Jersey, where DEA agents formulated a plan for the controlled delivery. Tr. 88–89, 95–96. The controlled delivery took place later that night at the Ramada Inn hotel in the Bronx. Tr. 102, 175. Supervised by undercover detective Jose Sandoval, Garcia Diaz met the defendant, Espino, in the lobby of the hotel, where Espino took possession of one of the two black duffel bags of heroin after a brief conversation with Garcia Diaz. Tr. 207, 210. Espino and Garcia Diaz then walked together out of the hotel lobby to place the black duffel bags into the back of a waiting car, different from the one Espino arrived in. Tr. 211. The driver of this vehicle was later discovered to be a livery cab driver who was directed by an unknown individual to pick up his "friend" at the hotel. Tr. 414–16. Once the bags were placed in the car, but before Espino could enter it, DEA agents converged on and arrested him. Tr. 273. Meanwhile, Garcia Diaz reentered the hotel lobby and handed Det. Sandoval a plastic bag containing $15,000 in cash, which the detective surmised was given to Garcia Diaz by Espino while the two were out of the sight of any law enforcement agents on scene. Tr. 216, 220.

### B.     The Indictment and Trial

Rafael Espino was indicted on one count of conspiracy to possess with intent to distribute one kilogram or more of heroin in violation of 21 U.S.C. §§ 841(b)(1)(A), 846. Indictment (Dkt. 1).  Before trial, Espino moved <u>in limine</u> to preclude admission of Garcia Diaz's post-arrest statements to law enforcement, arguing that the statements were hearsay to which no exception applied and that admitting his statements would violate the Confrontation Clause of the Sixth Amendment.  Def. Mots. in Limine (Dkt. 42).  The Court granted the motion, and trial began on September 24, 2019.  Minute Entry (Sept. 23, 2019).  On direct examination by the government, Det. Sandoval testified that Garcia Diaz said that he'd received the bag of cash from Espino.  Tr. 214.  The defense immediately raised a hearsay objection, which the Court sustained.  <u>Id.</u>  The Court did not admonish the jury to disregard the statement, reasoning that such admonishments can have the opposite effect of what is intended, and the defense did not request one.  Tr. 240–41.  After two days of trial, the jury began deliberations on September 26, 2019, and returned a guilty verdict later that day.  Tr. 524–25.

## II.     LEGAL STANDARD

### A.     Rule 29 Acquittal Standard

Rule 29 dictates that upon a defendant's motion, the court must "enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a).  It is well settled that "[a] defendant who challenges the sufficiency of the evidence to support his conviction 'bears a heavy burden.'"  <u>United States v. Awad</u>, 518 F. Supp. 2d 577, 581 (S.D.N.Y. 2007), <u>aff'd,</u> 369 F. App'x 242 (2d Cir. 2010) (quoting <u>United States v. Jackson</u>, 335 F.3d 170, 180 (2d Cir. 2003)).  When evaluating Rule 29 motions, the court "'must view the evidence in the light most favorable to the government, crediting every inference that could have been drawn in the government's favor.'"  <u>United States v. Torres</u>, 604 F.3d 58, 66 (2d Cir. 2010) (quoting <u>United States v. Chavez</u>, 549 F.3d 119, 124 (2d Cir. 2008)).  The court must also "defer 'to the jury's

determination of the weight of the evidence and the credibility of the witnesses, and to the jury's choice of the competing inferences that can be drawn from the evidence.'" Torres, 604 F.3d at 66 (quoting United States v. Morrison, 153 F.3d 34, 49 (2d Cir. 1998)). While "a conviction based on speculation and surmise alone cannot stand," United States v. D'Amato, 39 F.3d 1249, 1256 (2d Cir. 1994), the Government is permitted to "'prove its case solely through circumstantial evidence, provided, of course, that the government still demonstrates each element of the charged offense beyond a reasonable doubt.'" United States v. Hassan, 578 F.3d 108, 122 (2d Cir. 2008) (quoting United States v. Rodriguez, 392 F.3d 539, 544 (2d Cir. 2004)).

### B.      Rule 33 New Trial Standard

In deciding a Rule 33 motion, the court "must examine the entire case, take into account all facts and circumstances, and make an objective evaluation." United States v. Ferguson, 246 F.3d 129, 134 (2d Cir. 2001). "The ultimate test . . . is whether letting a guilty verdict stand would be a manifest injustice." Id. Such motions "are granted only in 'extraordinary circumstances,'" United States v. McCourty, 562 F.3d 458, 475 (2d Cir. 2009) (quoting United States v. Torres, 128 F.3d 38, 48 (2d Cir. 1997)), where a court is left with "a real concern that an innocent person may have been convicted." Ferguson, 246 F.3d at 134. When a defendant challenges a jury's verdict as against the weight of the evidence, "[t]he trial court must be satisfied that 'competent, satisfactory and sufficient evidence' in the record supports the jury verdict." Id. (quoting United States v. Sanchez, 969 F.2d 1409, 1413 (2d Cir. 1992)). "The district court must examine the entire case, take into account all facts and circumstances, and make an objective evaluation." Id. In doing so, the court "must strike a balance between weighing the evidence and credibility of the witnesses and not 'wholly usurp[ing]' the role of the jury." Id. at 133 (quoting United States v. Autuori, 212 F.3d 105, 120 (2d Cir. 2000)).

### III.   DISCUSSION

Espino challenges his conviction on two fronts. First, he argues that there was

insufficient evidence to permit a rational jury to infer that he knowingly participated in a conspiracy involving <u>narcotics</u>, as opposed to illegal activity generally. Mem. in Supp. of Mot. at 13–22 (Dkt. 78). In the alternative, Espino contends that an inadmissible hearsay statement that the government elicited from Det. Sandoval at trial so tainted the proceedings as to require a new trial. <u>Id.</u> at 23–28.

### A.      Espino's Knowledge of the Narcotics Conspiracy

Espino argues that there was insufficient evidence to prove that he "knew that the conspiracy involved a controlled substance," as is necessary to sustain a conviction for conspiracy to violate 21 U.S.C. § 841(a)(1). <u>Torres</u>, 604 F.3d at 65–66. Espino concedes that his conduct amounted to "suspicious behavior" that "may support an inference that Mr. Espino involved himself in some sort of criminal activity," but he contends that the government did not provide evidence that he knew of his involvement with <u>narcotics</u> <u>specifically</u>. Mem. in Supp. of Mot. at 14–15.

### 1.      Inferring Knowledge for "Trusted Members" of a Conspiracy

Citing <u>Anderson</u>, the government posits that a rational jury could conclude that Espino knew of his involvement with narcotics from a pair of linked inferences which the Second Circuit has previously and repeatedly endorsed. <u>United States v. Anderson</u>, 747 F.3d 51, 66 (2d Cir. 2014). "First, drug dealers would be very unlikely to confide hundreds of thousands of dollars' worth of drugs to the sole control of a person who was not a trusted member of the conspiracy. Second, a trusted member of the conspiracy may reasonably be expected to have knowledge of the nature of the conspiracy, i.e., distributing illegal drugs." <u>Id.</u> In <u>Anderson</u>, co-defendant Hakimi met defendant Anderson at a Wal-Mart at a prearranged time. <u>Id.</u> at 57. The two conversed in Anderson's truck, which contained $900,000 in ecstasy pills, then drove their own vehicles out to a dead-end road. <u>Id.</u> As Anderson exited her truck and leaned into Hakimi's car to talk to him, border patrol agents who were tailing the two converged, arresting them and finding the pills in Anderson's truck. <u>Id.</u> A jury convicted Hakimi of conspiracy to possess with intent to

distribute a controlled substance, but the district court granted a motion for acquittal on the grounds that the government did not present sufficient evidence to establish Hakimi's knowledge that he participated in a conspiracy specifically involving drugs. Id. at 59.

The Second Circuit restored Hakimi's conviction, finding the evidence sufficient to support the "trusted member" inference described above. See id. at 69. The court instructed that this inquiry is "heavily fact-specific, and typically permit[s] drawing the proposed inference in the context of numerous factors in addition to the value of the goods in question." Id. at 68. The court found it reasonable to infer that Hakimi would have taken sole custody of a large quantity of drugs worth $900,000 were the transaction not interrupted by law enforcement. Id. at 69. The court also pointed to Hakimi's extensive phone contacts with the conspiracy's principals, a cooperating defendant's testimony that the members of the conspiracy would not confer such valuable contraband to an untrusted individual, and that Hakimi arrived at the location of the transaction according to the plan. Anderson, 747 F.3d at 69–70. Further, the court "emphasize[d] that the high degree of deference we afford to a jury verdict is especially important when reviewing a conviction of conspiracy . . . because a conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court with the precision of a surgeon's scalpel." Id. at 72-73 (internal quotations omitted).

The facts in Anderson are markedly similar to the instant case. Espino arrived at a location and time that was prearranged by the conspiracy's principals, and was arrested before having the opportunity to leave the area with the drugs. Tr. 94, 98, 271–273. He took possession of at least one of the bags of drugs and placed it into the back of a waiting livery cab. Tr. 211. The amount of drugs was substantial, around twenty kilograms worth approximately $2 million. Tr. 255. Much like Anderson, a rational jury could find that had law enforcement not intervened, Espino would have left the hotel in the livery cab with the drugs in his sole possession, in turn supporting the inference that Espino was a trusted member of the conspiracy who would know of his involvement with narcotics.

As Espino points out, these cases are not identical; certain evidence from Anderson

is not present here.  <u>See</u> Reply 5–6 (Dkt. 83).  Namely, the government could not provide direct evidence of communications between Espino and any of the conspiracy's identified principals; the single cell phone he was arrested with had no such calls in its record.  Reply at 6; Mem. in Supp. of Mot. at 19 (Citing Tr. 295–96).  Espino also points to the lack of a cooperating witness testifying that the members of the conspiracy in this case would not entrust such valuable contraband to an untrusted participant.  Reply at 6–7.  These arguments are nominally correct, but do little to distinguish <u>Anderson</u>.

Although the government could not provide a direct record of Espino's communications with members of the conspiracy, the totality of the facts creates an obvious inference that such communications took place.  Notwithstanding some cosmic coincidence, Espino must have communicated with some member of the conspiracy in order to arrive at the appointed time and place.  Further, law enforcement used a simple but clever ploy in the course of their controlled delivery that cements the inference that Espino actively communicated with other members of the conspiracy.  Through Garcia Diaz, the DEA learned that the prospective buyer of the heroin demanded that Garcia Diaz book a room at the hotel in which to complete the transaction.  Tr. 264–66.  The DEA disallowed this in the interest of safety, and instead gave Garcia Diaz a non-existent room number – 126 – which he fed to his brother in Mexico.  Tr. 264–66.  When Espino arrived at the hotel, he asked the receptionist for room 126, greeted Garcia Diaz, and asked why he hadn't obtained a room, clearly implicating him in the conspiracy.  Tr. 208.  Again, for Espino to have this information, it is more than reasonable to infer that he communicated with some member of the conspiracy.

The lack of a cooperating defendant to describe the conspiracy in this case weakens the trusted member theory, but the absence is not fatal.  Espino is correct that the Second Circuit gave credence to the cooperating defendant in <u>Anderson</u> and found her testimony a significant factor reinforcing the theory.  747 F.3d at 70.  The absence of a similar witness in this case is certainly relevant, but Espino's intimation that testimony of this sort is <u>necessary</u> to sustain the theory mischaracterizes the holding in <u>Anderson</u>.  Rather, the

Second Circuit suggested that the cooperating witness was <u>so</u> persuasive that a rational trier of fact could <u>only</u> subscribe to the trusted member theory. <u>Id.</u> at 71 ("In fact, in light of Anderson's testimony regarding the position of trust held by drug couriers <u>within this very conspiracy</u>, the jury would have had to disregard uncontroverted evidence to reach the conclusion that Hakimi was an uninformed agent as opposed to a trusted insider") (emphasis in original). <u>Anderson</u> reinforced that the trusted member theory is simply a product of common sense, and dismissed inferring that members of a drug conspiracy would entrust an unknowing patsy with millions of dollars of contraband without evidence of that <u>modus operandi</u>. <u>Id.</u> at 70–71 ("It may be possible to imagine a circumstance in which an experienced drug smuggler could decide to entrust a million-dollar package of contraband to an unwitting courier. There is, however, simply no evidence that the conspiracy at issue in this case ever operated in this fashion"). Espino does not point to any evidence that this particular conspiracy uses "unwitting couriers," and instead relies on a vague, general statement by a government witness that criminal conspiracies may engage in "compartmentalizing" to keep their members from having all the facts. Reply at 6–7 (citing Tr. 459).

Espino's arguments against the sufficiency of the evidence supporting the trusted member inference are not persuasive. A rational trier of fact could infer that Espino was a trusted member of the conspiracy. Espino argues that certain cases militate against applying the inference here, which will be discussed below.

### 2. Evidence Undermining the Inference that Espino was a Trusted Member of the Conspiracy

Espino contends that the simple fact that he may have received or helped transport the duffel bags is insufficient for a jury to infer that he knew the bags contained narcotics. Mem. in Supp. of Mot. at 15. He cites <u>Torres</u>, in which the Second Circuit vacated the defendant's drug conspiracy conviction for lack of evidence from which a jury could infer his specific knowledge of his involvement with drugs. 604 F.3d 58. In <u>Torres</u>, the court

pointed to absence of evidence of Torres's knowledge – "[t]here was, for example, no cooperating witness testifying at trial. There was no evidence of any drug records implicating him. The cocaine was well concealed and not visible. There was no proof of any narcotics-related conversation to which Torres was a party." Id. at 70.

Espino also cites United States v. Lorenzo, 534 F.3d 153 (2d Cir. 2008) in which the principal in a drug conspiracy instructed a courier carrying a suitcase with $250,000 worth of drugs to make telephone contact with the defendant, who had been present at an earlier transaction and had delivered a package of cash to the courier on that occasion. Id. at 157, 161. The courier attempted to call the defendant, but his wife answered the phone because he was asleep. She invited the courier to come to her home temporarily, which the courier did, bringing the suitcases containing drugs. Id. at 157. The defendant, now awake, was then arrested. The government argued on appeal that it could be inferred that the principal "would not have entrusted [the defendant] with the suitcases concealing the narcotics . . . unless [the defendant] had known what was concealed within them." Id. at 161. The Second Circuit held that the proposed inference, resting primarily on the "unfulfilled request for [the defendant]," was "speculative and attenuated," having been "severel[y] undermine[d]" by his wife's failure to awaken him when the courier attempted to establish contact with him. Lorenzo, 534 F.3d at 161.

In Anderson, the Second Circuit distinguished Torres by pointing out that because Torres was accompanied by co-conspirators during his attempts to receive the drugs, there was no evidence to indicate that Torres would ever have "sole possession" of the drugs so as to place him in a position of trust within the conspiracy, whereas the evidence in Anderson showed that the defendant was likely going to leave with the drugs on his own. 747 F.3d at 71. To distinguish Lorenzo, the court explained that the peculiar circumstances in that case involving a sleeping defendant and his wife rendered the inference unreasonable, while no such circumstances existed in Anderson. See id. The Second Circuit found Torres and Lorenzo inapposite, explaining that the defense failed to put forth evidence undermining the inference that the defendant was a trusted member of

the conspiracy.  Id. ("In contrast to Lorenzo and Torres, we find no evidence here that "severely undermines" the inference that Hakimi enjoyed a position of trust within the conspiracy or that he had not been assigned to take custody over the package") (emphasis added).

Like Anderson, and unlike Torres, there is no evidence to show that Espino was accompanied by anyone during the transaction.  Nor is there evidence to show that Espino would have been accompanied by anyone had he been able to leave the site of the transaction.[1]  As discussed above, a rational jury could infer that, were it not for the interruption of law enforcement, Espino would have left the hotel in the livery cab with the drugs in his sole possession, supporting the government's trusted member theory.  Espino's argument that this amounts to "speculation" demands an inappropriate degree of skepticism towards the jury.  Reply at 4.  Rather than holding the jury to rational inferences, he asks that they infer nothing at all.  Further, unlike Lorenzo, Espino fails to provide any countervailing evidence to "severely undermine" the trusted member inference and reverts to arguing the paucity of the government's evidence to support it.  As discussed above, the government provided ample evidence to this effect, allowing a rational trier of fact to conclude that Espino knew that the conspiracy involved narcotics.

The Court finds that a rational trier of fact could have inferred that Espino was a trusted member of the conspiracy, and from that, inferred that Espino knew that the conspiracy involved narcotics.  Espino's motion to acquit is denied.

### B.    Det. Sandoval's Hearsay Statement at Trial

Alternatively, Espino argues that a new trial is necessary because the government elicited a hearsay statement that was "so prejudicial that it denied [him] a fair trial."  Mem. in Supp. of Mot. at 25–28.  On direct, the government asked the undercover detective who oversaw the controlled delivery from within the lobby, Det. Sandoval, what he discussed

---

[1] Excepting the livery cab driver, whose accidental involvement is clearly not the type of participatory accompaniment described in Torres.

with Garcia Diaz immediately after the delivery took place. Tr. 214. Det. Sandoval testified that Garcia Diaz displayed a plastic bag full of cash and claimed that Espino gave it to him. Id. Defense counsel timely objected, and the Court sustained the objection. Id. Espino moved for a mistrial shortly after, which the Court denied. Tr. 240–41. The Court explained that it did not admonish the jury because admonishments can be counterproductive, as they draw attention to the excluded evidence. Id. Espino never requested that the jury be admonished to disregard the statement specifically and does not argue that the Court erred procedurally in its handling of the hearsay statement.

Espino cites several instances of new trials granted for prejudicial hearsay statements admitted in error.[2] Mem. in Supp. of Mot. at 25 (citing United States v. Gomez, 617 F.3d 88, 90 (2d Cir. 2010); United States v. Figueroa, 750 F.2d 232, 235 (2d Cir. 1984); United States v. Check, 582 F.2d 668, 670 (2d Cir. 1978). Rule 33 comes into force where "letting a guilty verdict stand would be a manifest injustice." Ferguson, 246 F.3d at 134. Conviction should be reversed where error at the trial court had "substantial and injurious effect or influence in determining the jury's verdict." Kotteakos v. United States, 328 U.S. 750, 776, 66 S. Ct. 1239, 90 L. Ed. 1557 (1946). However, "error is harmless if it is highly probable that it did not contribute to the verdict." Gomez, 617 F.3d at 90. To evaluate if the error was harmless, the court should consider four factors: "(1) the overall strength of the prosecutor's case; (2) the prosecutor's conduct with respect to the improperly admitted evidence; (3) the importance of the wrongly admitted testimony; and (4) whether such evidence was cumulative of other properly admitted evidence." Id. at 95.

The prejudicial impact of the evidence at issue, if any, was minimal; as discussed

---

[2] As the government correctly points out, the cases Espino relies upon in his motion involved trial courts that erroneously admitted prejudicial hearsay statements. Reply at 27. Tellingly, Espino does not cite a single case in which the Second Circuit reversed a conviction for a hearsay statement that, as in this case, was properly excluded by the trial court. This does not necessarily mean, however, that Rule 33 has no application here. It is certainly possible to imagine that even a properly excluded hearsay statement could taint the jury beyond repair, so this analysis applies the same principles courts have used in instances of error.

above, the government provided a slew of evidence implicating Espino in the conspiracy. Most of that evidence was not directly related to the bag of cash and would maintain its inculpatory force even if the bag of cash were never mentioned. The Court's analysis of the Rule 29 motion demonstrates this clearly by justifying the conviction without any mention of the bag of cash. Even ignoring the bag of cash entirely, there was more than enough evidence for a rational jury to convict Espino.

The hearsay at issue was not particularly important and was redundant to the properly admitted evidence. The assertion contained within Det. Sandoval's hearsay statement – that Espino gave the bag of cash to Garcia Diaz – is well supported by other evidence, diminishing the impact of the hearsay. Tr. 214. Although the government did not produce direct evidence showing that Espino gave Garcia Diaz the bag of cash, that is the only rational conclusion to draw based on the evidence provided. The DEA searched Garcia Diaz twice between his arrest and the controlled delivery, including immediately before the controlled delivery, and he was supervised by Det. Sandoval throughout the course of the delivery. Tr. 312, 237. The only point at which law enforcement did not have a direct line of sight on Garcia Diaz during the delivery was a brief interval, no more than a minute, when Garcia Diaz and Espino were standing behind the tailgate of the livery cab which blocked Det. Sandoval's view. Tr. 250. The only logical inference to draw from this evidence is that Espino gave Garcia Diaz the bag of cash, likely while the tailgate of the cab blocked law enforcement's sight. Espino does not offer an alternative explanation for Garcia Diaz's possession of the bag, nor does one readily spring to mind. Det. Sandoval's hearsay statement simply confirmed what a rational jury would have assumed without it.

Nor can Espino find refuge in prosecutorial misconduct. Without saying so outright, Espino intimates that the government intentionally elicited the hearsay statement despite the Court's ruling in limine prohibiting it. Mem. in Supp. of Mot. at 24. Keeping in mind that the government was given substantial notice of the broad inadmissibility of Garcia Diaz's post-arrest statements, its questions of "Did you have a conversation with

Oscar Garcia?" and "What did you discuss?" were, at best, troublingly imprecise. Even assuming the worst, however, this was a minor indiscretion that had minimal impact on the proceedings. It was not part of a pattern of misconduct; rather, it was a single misstep in an otherwise well-conducted prosecution. Espino also points out that the government repeatedly referenced the bag of cash in its closing and argues that these references highlight the impact of Det. Sandoval's hearsay statement. Mem. in Supp. of Mot. 9–10, 27. As discussed above, the import of the bag of cash is apparent with or without Det. Sandoval's statement confirming it. Had the government referred to the inadmissible hearsay itself in its closing, prosecutorial misconduct might play a larger role – but it did not.

The Court denies the motion for a new trial. The Court did not err, because the objection to the impermissible hearsay was timely granted. To the extent that Rule 33 is applicable in the absence of error, the statement was harmless: the government's case was strong without it; the prosecutorial misconduct, if any, was minimal; the statement was only moderately important; and the statement was cumulative to the admissible evidence.

## IV. CONCLUSION

For the foregoing reasons, both the motion to acquit and the motion for a new trial are denied.

**IT IS SO ORDERED.**

Dated: January 21, 2020

_____
CHARLES R. BREYER
United States District Judge